This case is Eisenhauer v. Culinary Institute of America. The case is Eisenhauer v. Culinary Institute of America. This appeal involves a female professor on the cooking faculty at the Culinary Institute of America, who asserts Equal Pay Act claims under federal and state law, based on a similarly situated male colleague who, since 2017 and forever into the future, has been paid increasingly more than the plaintiff for doing the exact same job. Now, at the outset, two points should be emphasized. Number one, this is a pure Equal Pay Act case. There are no concurrent sex discrimination claims under either federal or state law, so there, in other cases, that combination has somehow, sometimes confused the analysis. Here we have a pure Equal Pay Act claim. The other issue that I think needs to be underscored is that the compensation plan at issue in this case is wholly unique and different than the compensation plans in any of the previous cases that have been referred to by the parties in their briefs. And it's the uniqueness of this plan that raises, in our view, the fundamental question in this case. And that is, after the plaintiff has established her prima facie case showing that she and her male colleague are performing the exact same job and she's being paid less, has the employer satisfied its affirmative defense? Here it relies on the catch-all, other factor other than sex. And the issue in this case, the key issue in the plaintiff's view, is how that factor is interpreted and applied to the unique compensation plan used by the Culinary Institute of America. So let me ask you a hypothetical question, if I may. Let us say that you have an employer who, more or less at the same moment, hires two different people for the same job. Let's say it's a fairly high-level job, but they're both hired to do the same thing. And the two people are different in this fashion. One of them is a young person, a bright young person, who looks like the person regardless of gender or sex, has a promising future, but has no college degrees, has no experience in the world. Let's say the person is 22 years old and is completely unknown in the field, has no reputation. The other person is a person who has 15 years' experience in the field, has achieved enormous distinction, is widely known for has written articles that have attracted attention, is famous, has worked, say, for 15 years, 10 years in a government agency that has supervisory responsibility for these things, something like the SEC if it's the securities field. Are you saying that if the employer doesn't pay those two people the same thing, that as of the moment of the hire, that employer is in violation of the EPA? Not as of the moment of their hire. Why not? Because I think the key goes back to what the Aldridge case says. What the Aldridge case says is that what we have to look at are the alleged neutral qualifications. To what extent are they related to the job, and to what extent do they continue to be related to the job? So at the point of hire, I think a very strong argument can be made that existing credentials and experience and so forth obviously are relevant at that point in time, materially relevant, to hiring that position and what that person gets paid for. But once the person is established in the job, at some period of time, what happened before is no longer directly job-related to what they're doing today. And this has been recognized. The starting salary conundrum has been recognized by the Seventh Circuit, the Sixth Circuit, and the Eleventh Circuit. And what they say is at some point, once someone, this is the language used in the Eleventh Circuit case that we cite, at some point, once the person is established in the position, that their compensation can no longer be determined on what happened in the past. It has to be determined on their current performance or other job-related factors. And so there isn't a bright-line rule, but there is a rule. And I think the rule should be something in effect that if you're going to rely on prior qualifications, if you're going to rely on that starting salary issue, you can only continue to rely on it when those original factors continue to be materially relevant to the person's performance of the job. Here, Ms. Eisenhower, Chef Eisenhower, was hired in 2002. Chef Pirillo was hired in 2008. They do the exact same job. Chef Eisenhower has been in that position now for 20 years. And at the time when this discrepancy became insurmountable in 2017, for 15 years. Chef Pirillo had been in that position as of 2017 for nine years. They had each gone through each of the levels within the school to establish their credentials, training, experience, qualifications, at each step of the way within the school. At some point- Let me ask something else. The differential, the original differential, part of that differential, if I understand correctly, included years of experience in professional kitchens, in restaurant kitchens. And has that different now- One would think that a school advertising itself, or whether it's advertising itself or just the reputation of the school, might depend to a certain degree, if you're talking about a culinary school, on the real world kitchen, restaurant kitchen experience of the people who are teaching. I may be mistaken about this, but I think it's correct in the record that that differential between the two people, the comparator and the plaintiff, has not gone away. It remains true that the comparator still has what he had at the time of hire, which is a certain number of years, valuable years of kitchen experience, which the plaintiff doesn't have, if I'm not mistaken, because she came in at an early stage as a teacher at the Culinary Institute and never acquired that. So if I'm correct about the facts, why doesn't that continue to be pertinent? Why wouldn't it be a drawing card for the Culinary Institute to say, our teaching chefs have so many, this one, this one, and this one, have 15 years of teaching experience in fine restaurants? Well, first of all, you're not entirely correct on the facts. Chef Eisenhower came to CIA with substantial experience as well. But whatever the original- Not as much. Arguably. But whatever the original disparity was 20 years ago, of course, as a philosophical or factual matter, it still exists. The question under the EPA is, can you have a situation where a legitimate factor 20 years ago can continue to justify a differential in pay today? We submit that the answer to that is- Why not? If when you look at the website, and I don't know whether this is true of the website of the Culinary Institute, but it could easily be true, that with each of their professors, the little paragraph that describes each professor, for professors who have had luminous restaurant kitchen experience, that would be something that would be featured in that paragraph. This professor spent 10 years in the kitchens of Jean Georges or whatever, and that would be something that would visibly distinguish one person's paragraph from another person's paragraph. That would continue. What's the rebuttal to that? Well, I think the rebuttal to that is that that's a question of fact, that it would be the burden of the employer under the affirmative defense to establish as a matter of fact that those prior credentials from however many years ago continue to be relevant in justifying today's salary discrepancy. Why would that be part of an affirmative defense as opposed to assessing whether someone is the appropriate comparator? Well, because with the analysis for whether someone's an appropriate comparator, we look under the EPA at the actual job they do. We actually look at what they do day by day, and we look, and so that's the first step. And here there's no question that we have similarly situated people. Then you'd have issues like, for example, seniority. But what's interesting in this case is that the plaintiff has six years seniority. So the EPA acknowledges- With seniority, I'm just trying to understand how this should work in the pretrial process. Seniority is also an affirmative defense. But in the plaintiff's case here, you selected the comparator and excluded others by looking at a range of factors to find the one you say is most similarly situated. So you were looking at things like seniority and other factors, correct? Well, we did that ourself in selecting the comparator. That's correct. Because we were anticipating the affirmative defenses, which the employer would put forward if we identified certain comparators. That's true. But that's not part of the initial analysis for just determining whether someone is similarly situated within the meaning of the EPA. So just following up on my colleague's question, so you're not saying that in every case if two people take the same job at the same time and one has superior qualifications, you're not saying in every case that at some point in time they must be paid the same thing because these starting salary differences dissipate. You're saying in this case the affirmative defense can't be made out. Correct. I'm saying in this case because I think in all cases the question in the affirmative defense is going to be fact specific. The employer is going to say you have a salary discrepancy and we're going to justify it based on, say, the starting salary rationale. And they have that obligation, which is based on credentials and experience and so on. They have the affirmative burden to prove in that situation that those factors continue to be job related. I think the Aldridge case really is the key case here because what Aldridge said was, I'm sorry, if I may continue, what Aldridge said was just because you have a facially neutral classification system, payment system, in that case it was a civil service system, the court said you still have to show that whatever it is about that system that's causing the disparity is job related, not that it's gender neutral. This is not a discrimination case. It does not defeat an Equal Pay Act claim if the plaintiff can't show intentional discrimination. This is a question that focuses on jobs and people being paid the same if they do the same work, subject to the affirmative defenses. I actually think the situation in a case like presented in this one is not going to come up that often because we have a very unique compensation plan. So let me ask you something. Supposing that the, this was a grant of summary judgment. This is not on the pleadings. This is a grant of summary judgment. Yes. So supposing, taking the hypothetical we've been talking about, which is pretty much the same as this case. Supposing the district judge said in its ruling, in the court's ruling granting summary judgment for the defendant that I find that as a matter of law, indisputably, the additional kitchen experience acquired years ago by the person who for that reason received a much higher salary at the outset, that that difference continues to be relevant. That a jury could not find otherwise than in view of the fact that the credentials of the two teachers given on the website feature the kitchen experience of their various professors. That difference has not dissipated. It continues to be relevant in attracting students to this educational institution. Would that then answer the problem? And you said that it's an affirmative defense and therefore the court's ruling is wrong. But if the court had expressed the ruling including that kind of observation, what would you say about that? Well, I would say that that is an unsupported, clearly erroneous factual finding because there's no evidence of the record, in the record, that that is the issue. And furthermore, within the actual compensation plan. No evidence in this record, you mean? Correct. In this case? Correct. But if there were, if there were, I mean if there were, if the record included the website of the institute and the website of the institute did say about professors who had valuable, prominent restaurant kitchen experience and featured that next to them, would that then make the summary judgment appropriate? In this particular case, it wouldn't because under the testimony given from the school itself, that wasn't, that's not a factor in how the compensation plan operates. Certainly, if the school said our compensation plan includes that kind of factor, then that factor may very well be relevant to the analysis. But we have a very unique situation here where essentially what the school says is we will look at these qualifications and credentials. I think you're being inconsistent because going back to my first question, you said, I think appropriately, that with the passage of time, a differentiation which is legitimate at the outset because of prior differences in experience dissipates and the burden would be on the employer to show that the original justification for the difference continued to have relevance, to have job related relevance. Now you're saying that doesn't, now you're saying that's irrelevant. No, I- I think you're taking inconsistent positions. I don't think so, your honor. I think I'm saying that number one, as a factual matter, that wasn't the position that the school took or the evidence that they submitted. And furthermore, that that issue about starting salary and in particular, original credentials and experience has no role in the actual compensation plan in this case. So in the hypothetical, yes, in a hypothetical situation, you're going to have- but it has a role in whether the relevance of the initial distinction continues to have effect, whether it has dissipated over time so that they really are on an equal footing or whether the justification that originally justified the high salary, which you said was fine, continues to have pertinence to a salary differentiation. Well, I suppose the school could have made that argument in this case, but they didn't make that argument. Could you address the compensation plan? And this is a variation on what we were exploring. You're not challenging the differential in the initial starting salaries. And then there is a collective bargaining agreement that has a set of terms. And was your client aware of those terms? Well, over time while she works there, she's aware of those terms. So everyone gets fixed percentage increases and periodic amounts that are periodically raised when the agreement is renegotiated for becoming assistant professor and associate professor and full professor. And you get additional compensation if you obtain certain degrees. Am I right in understanding essentially what happened to both of their salaries after they started? Yes. So why isn't that arrangement a legitimate business arrangement, an agreement with the union that justifies differentials that occurred after they both started? I think it's a question of the level of analysis. At the highest level, of course, that's a valid business reason or a valid business interest to operate in compliance with the collective bargaining agreement. But just like the civil service system in Aldrich, the question is how do the particulars of that agreement impact compensation? If the particulars of that agreement result in an improper disparate level of salary, remember we have a situation here where the plaintiff has six years seniority, that she advanced through all the academic levels before the comparator did. She's not at a lower academic level. She is a professor. And yet, and they also have the exact same degrees, both BAs, both MBAs from the exact same colleges. But because of the changing mathematics of the collective bargaining agreement, there's nothing to do with their jobs or their performance, just the mathematics of the collective bargaining agreement over 15 and 20 years. The result is that Chef Perillo gets paid much more and will continue to be paid more. The gap will grow. And there's literally nothing Chef Eisenhower can do to ever close that gap, let alone be paid the same thing. So she has seniority. She's gone through every layer of assessment and qualifications within the school over many years. And yet, just because of the mathematics of the CBA, you have this really unjust disparity. The gap has diminished from $20,000 to $7,000, isn't that right? I'm sorry? The gap has diminished over time from initially $20,000 to $7,000. Well, their initial hires were $20,000 apart, although they were not at the same time. Now the differentiation is $7,000, right? I don't think that's an accurate comparison because Anita was hired in 2002 at $50,000, and Chef Perillo was hired in 2008 at $70,000. When Chef Perillo started at CIA, Chef Eisenhower was already making $70,000 plus. So when he started, she was making a little more. I think it was about $800 more. So at that point in time, they're essentially neck and neck. And then because of really just the arbitrariness of the numbers, because if you look at the history of their salary, you'll see sometimes Chef Eisenhower is higher. Sometimes Chef Perillo is higher. Then Chef Eisenhower is higher. And it kind of goes back and forth. And then they reach this point where they basically both have accomplished everything they can accomplish within CIA, and yet Chef Perillo is paid now more, and it's growing every year due only to the mathematics. This is a very unique situation. There are no individualized determinations. There are no annual bonuses. There's no equity adjustments. There's nothing like that under the CIA compensation plan. Let me ask you, just to understand the record, you've underscored the uniqueness of this case. You began, I think, your very first sentence with something on the order of the uniqueness of the case. If that is true, am I to assume that there's no precedent that's directly on point? I understand that there are rarely situations in which cases are identical, but the uniqueness of the case that you've emphasized suggests to me that we are presented with a relatively unusual situation, or at least this is a case of first impression in some sense. Is that accurate? Do I understand it? I believe it's essentially a case of first impression with respect to how you look at the actual compensation plan here. I wouldn't call it a case of first impression in terms of it being a pure EPA Act case. But, yes, in terms of that issue, when you look at the existing precedents in this court and in other courts, all the cases that I can think of always had both an EPA Act claim and a Sex Discrimination Act claim, and those two analyses oftentimes overlapped. And so, yes, this case presents a very clear opportunity to analyze the EPA separate and apart from any issues of allegations of intentional sex discrimination. Well, let me pursue some other matters regarding the record. Judge Livingston referred to the collective bargaining agreement. How long has that collective bargaining agreement been in effect? Do you know? Well, the collective bargaining agreement, to my knowledge, the union and the CBA predated Chef Eisenhower coming to CIA, and the operative agreements tend to be renewed every, I think, four or five years. And what is the union? I'm just curious. There's a reference to the Culinary Teachers Association, but what's the union's name? What union signed the collective bargaining agreement? I'm sorry. I just didn't catch that. The union. Yes. What's the name of the union? A union, obviously. I'm sorry. I'm having a hard time hearing you. I'm sorry. What about the union? There is a collective bargaining agreement. Yes, there is. Who are the parties to the collective bargaining agreement? I'm sorry. Yes, it's the union, the Culinary Teachers Association, and the college. And is that a union that operates only at the CIA, or is it part of a national union? I'm not sure of the answer. I believe it's a national union, but they have a CIA-specific agreement. All right. Of course. Now, is your client a member of that union? Yes. And has been throughout the period in question? Yes. The agreement and the union itself is probably not indifferent to the question of seniority. One associates collective bargaining agreements with the preoccupation of the unions involved with seniority. But you're suggesting that seniority has not – well, you tell me what the effect of the collective bargaining agreement is. In this particular case, the concept of seniority plays no role in how the compensation plan operates. The way the compensation works at CIA, the only point in time where there is an individualized assessment is at the point of initial hiring and the establishment of the starting salary. From that point on, everything operates across the board uniformly for all faculty members according to the collective bargaining agreement. That is the seniority system, step by step. I suppose. But regardless, for example, of how long you've been at the college, you get the same 2% annual raise, for example. And regardless of how long you've been at the college, if you qualify for a promotion to another level, you get whatever bump is paid under that currently existing collective bargaining agreement. Thank you. Thank you. Thank you, your honors. May it please the court, Jim Driscoll McEachran on behalf of the EEOC. We ask this court to clarify that a single comparator is sufficient for the prima facie case and that the burden should not shift to the plaintiff to prove pretext under the Equal Pay Act. On the prima facie case, the Supreme Court in Corning Glass Works described the function and operation of the Equal Pay Act as simple and straightforward. It was designed to ensure that equal work would be rewarded with equal wages. When a plaintiff proves that another employee performing the same work is paid more, they have made their prima facie case. They have demonstrated that equal work was rewarded with unequal wages. To be clear, that does not mean that the plaintiff wins their case. That just means they presented enough evidence to shift the burden to the defendant to prove one of the four affirmative defenses set out in the statute. And once we're in those affirmative defenses, other employees' compensation may well be relevant and may show, for example, that a factor other than sex explains the wage disparity. But Appleby here wants to push that information about other employees' compensation into the prima facie case. But that is neither simple nor straightforward. As this case demonstrates, there have been a variety of potential comparators suggested. And as Ms. Eisenhower's reply brief points out, the comparators named in the Appleby's response brief actually make more on average than Ms. Eisenhower. The better rule is a rule unambiguously adopted by the Fourth Circuit and the Eleventh Circuit that a single comparator is sufficient. Is sufficient in all cases, or is sufficient in some contexts? Your Honor, it should be sufficient in all cases. Again, the context of the Equal Pay Act should be simple and straightforward. I guess I'm, you may be right, but I'm stumbling over that a little. A prima facie showing raises a presumption of discrimination, or in this context, trying not to blur the two statutes, so a presumption of an equal pay violation that must then be rebutted with the affirmative defense. It puts the burden on the employer to show by a preponderance that an affirmative defense applies, right? That's correct, Your Honor. So I can, and maybe this is one of them, but in a small setting with a small number of comparators, such an inference might seem appropriate just thinking of the traffic copying of proof in a smaller setting. But if you thought, if you looked at a larger company with, say, 500 account executives all performing substantially the same work, would it really help to say there was a prima facie case just because there was a pay disparity between one person and another person of the opposite sex without some further look at the, at other comparators? Your Honor, if I may break that in two parts. Yes, there would be a prima facie case for that single individual. In 216B, the EPA provides for an individual action. As the Fourth Circuit said in Maryland Insurance, the EPA does not require class-wide discrimination. So you can see courts like the Ninth Circuit and Maricopa Community Colleges say we don't need to look at other comparators of the same sex that are paying more. But again, that doesn't prove the entire case. That is just enough to get to the affirmative defenses. And it may well be that those other 500 employees help demonstrate that seniority, merit, or incentive, or some other factor than sex caused that disparity. And that the reason for that may be so obvious that the case is not brought because the affirmative defense is so clear. If I may, I apologize, I don't mean to cut you off, Your Honor. I just want to touch briefly on pretext as well. When- So- Yes, Your Honor. Let me just stick with your answer to Judge Livingston's question. So, if I understand correctly, the significance of the prima facie case is only that if after that prima facie case has been established, a plaintiff comes into court and shows I make less than so-and-so of a different sex and we have the same job responsibilities. If the case stops there, if that's the end of the case, no further evidence is submitted by anybody else. The plaintiff will win. But if the defendant comes in and says, as Judge Livingston suggested, well, you know, there are 500 people in our company who do the same job and 499 of them do not make-I mean that they're all-the rest-there is no disparity to be found except in the comparator situation that the plaintiff selected. Yes, that particular comparison of the plaintiff to a comparator shows the plaintiff behind, but that's not something that you find in the company generally. Where are we then? Let's say to make the case extreme that it's a woman who's bringing the case and she's pointing to one man who makes more than she does, and the defendant shows that all the other women who are numerous make more than the males. If I may continue, I do see my time has expired. You may. Yes. Thank you, Your Honor. I would say that that evidence would go to whatever the factor other than sex that the employer is relying on. So in your example, if there are multiple female employees that were making more, the evidence would go to why. So is that because the plaintiff is in a seniority system and those other female employees are paid more because of seniority or merit or incentive? So that could be very powerful evidence that goes to a particular affirmative defense, but it would need to be one of the affirmative defenses set out in statute or that catch-all other factor than sex. If I may briefly touch on pretext, though, I know my time has expired. We just want to point out that it's critically important that the burden-shifting framework for the Equal Pay Act not be conflated with the McDonnell-Douglas framework that applies to statutes like Title VII that require discriminatory intent. McDonnell-Douglas does not apply because the Equal Pay Act, as we've discussed, does not require intent. So when an employer in the Equal Pay Act context proves their affirmative defense, there's no role for pretext because the employer has just proven the actual cause for the wage disparity. We ask this Court to clarify both that the single comparator is sufficient and that consistent with the two-part burden-shifting framework in Corning-Glass works, that there is no role for a third step pushing the burden back to the plaintiff to prove pretext. Just in making sure I understand going back to the single comparator, so in the hypothetical of 500 and a woman identifies one person who is making more than she is and one man that's making more, but looked at the 500 as a whole, most of the women in the company and there are many are making more than the men, and the company says, points these facts out. You're saying that's part of their affirmative defense. But that wouldn't be enough. They would also need to show, they'd need to say, we pay on a merit-based system. And wouldn't that inevitably send that case to trial? Again, I'm just trying to understand the traffic copping here. It depends on what the proof actually is, which affirmative defense that the employer puts forward. Because I just want to clarify, we wouldn't be looking at the other employees to say, well, now we're looking to see whether or not there's discriminatory intent involved. I know it's not intent, but is there an equal pay violation? I apologize for interrupting. The prima facie case, yes, and then it would just depend how they marshal that defense. And it would depend on the employer which affirmative defense. So the evidence may be so compelling that a district court would grant summary judgment on that basis. It would just depend on how those facts match up to the particular legal standard for the affirmative defense actually articulated. Whereas here, when that pretext and issue gets messy, we see district courts relying on McDonnell Douglas to say things as the district court did here, that the defendant articulated a legitimate non-discriminatory defense before requiring a plaintiff to prove pretext. The employer actually has to prove that affirmative defense. And so that's why we think this should be remanded for consideration under the proper legal standard. Thank you. Are you saying that discriminatory intent is irrelevant so that the plaintiff, if the employer defended on the grounds of a merit system, and the plaintiff then proffered evidence that executives of the company had said things clearly reflecting sex discrimination? Say, oh, you know, she's one of the girls. We're not going to pay her that much. She's one of the girls. That kind of evidence. Are you saying that evidence would not be admissible, that there is no place for that evidence in the trial, so that the plaintiff could not put on that evidence and the employer could not then rebut it to try to show that there was no discriminatory intent to rebut the affirmative, where they're disputing over whether the employer has shown an affirmative defense? No, Your Honor, I don't think that's the case because, again, the employer has to prove that the defense actually caused the wage disparity. So while EPA is described as a strict liability standard, and we're not looking for discriminatory intent in the same way we would under the McDonald-Douglas framework, if there's evidence that shows that whatever the affirmative defense is, the merit system, the incentive system, was not actually the cause for the wage disparity, and those comments perhaps could show that while there is a merit system in place, it is not the actual reason for the wage disparity, that may well be relevant to the affirmative defense. Thank you. Good morning, Your Honors. May it please the Court. My name is Rebecca McCloskey. I represent Apelli Culinary Institute of America. Your Honors, the District Court properly dismissed Ms. Eisenhower's equal pay claim because the differential in wages between Eisenhower and her chosen comparator, Mr. Perillo, is caused by a factor other than tax, which is the collective bargaining agreement that dictates all faculty increases once the starting salary is set. It's helpful to start with the language of the Equal Pay Act itself, which says no employer shall discriminate between employees on the basis of sex by paying wages less than are paid to employees of the opposite sex. Yet Eisenhower's whole case is based on the mere existence of a wage differential without any evidence that she was paid less on the basis of sex. There is none. She offers no evidence of discrimination because the statute doesn't require intentional discrimination, yet the word discrimination is in the statute, and the meaning is important. The wage differential must be on the basis of sex to prove an equal pay claim. This principle is dispositive of both issues on appeal. Without looking at all of the people who perform the same job, there's no way to know if the differential is on the basis of sex. That's why pointing to just one comparator is not enough when there are other comparators who are doing the same job. It's also why the Culinary Institute proved its affirmative defense, the differential caused by a factor other than sex, because it's undisputed the collective bargaining agreement here is gender neutral, evenly applied, once the starting salaries are set. There's nothing unique, by the way, about this collective bargaining agreement. It has a percentage annual increase each year. It's negotiated on behalf of Ms. Eisenhower's own union, on behalf of herself and all of her other faculty members. Let me ask you about the collective bargaining agreement. There is a provision in the collective bargaining agreement at JA80, for example. Article 16 of the collective bargaining agreement provides for a grievance procedure. Yes, Your Honor. Was this grievance procedure ever employed by the plaintiff here? It was not, Your Honor. Could she have done so? She absolutely could have. The grievance procedure generally refers to as labor arbitration. There is an arbitrator in place, right? Yes, Your Honor. Could the arbitrator have decided this question? Well, the arbitrator would be deciding whether the employer had complied with the terms of the collective bargaining agreement or not. The arbitrator would not be deciding whether there was an Equal Pay Act violation, just that it was consistently applied in terms of the raises for Ms. Eisenhower and every other faculty. Presumably, equitable factors would be before the arbitrator. I would imagine that that would be arguably a successful or a quick, a rather quick remedy for someone in her position. But you're telling us that the record shows no, there's never been any particular interest in going through the grievance procedure of the collective bargaining agreement. I don't want to speak outside of the record, Your Honor, but I understand... Nothing in the record suggests that the grievance procedure, Article 16, was ever invoked. It was not. For the exact reason that she does not dispute that she received exactly the same raises for the promotions that she received and for the additional degrees she earned that would have been received by any other faculty member at the time that she received them. Your answers to Judge Cabranes seem to me to suggest that she didn't have a grievance. The grievance would be they didn't act in accordance with what's required by the collective bargaining agreement. She's not saying that they didn't act in accordance with it, and she has no such claim. Her claim is that what she got from their observance of the collective bargaining agreement is a pay differential that she argues is illegal under the EPA. So she didn't have a grievance to bring. Isn't that right? Your Honor, to the extent she wanted additional pay outside of the confines of the collective bargaining agreement, that's what brings her here, but you're correct. And the union had no appetite for pursuing any, you know, supposed disparity in wages because... That's not what the arbitrators are there for. The arbitrator is not there as a court to rule on whether there was a violation of federal law. They're there to rule on the requirements of the collective bargaining agreement. That's right, and to the extent there was any confusion over that, I fully agree with both of you actually on that point. But as I was, you know, referring to, this is a very standard collective bargaining agreement. In Birchmore, this exact type of case came up, or collective bargaining agreement situation came up. It was starting salaries that were different based on different qualifications, and then every year once a teacher was set into their particular step, every single teacher got one step each year. That was it. Same situation here. You get the same annual increase that all other faculty members are getting. You also can add to that by getting additional degrees and additional promotions, which both Parillo and Eisenhower did obtain. In terms of whether Mrs. Eisenhower could ever make more, she actually could if she were to pursue a doctorate degree or a certified master chef or some other type of degree that's listed on JA 115. So it's not the situation where, you know, she's forever stuck where she is. But given that, you know, currently they have the same qualifications, I do so concede that. But the point is, again, is it on the basis of sex? It is not on the basis of sex, and how do we know? If Mrs. Eisenhower was a man when she was hired with the qualifications that she had and began at the starting salary she had, she'd still be paid the same. If Parillo was a woman when he started and he had the same qualifications he brought to the table, same starting salary, he'd be paid the same that he is today as well. That's how you know it's not on the basis of sex. And there's nothing arbitrary at all about the way that their salaries went up and down. It is due only to mathematics, and it's specifically spelled out by all these criteria. Your adversary argued at the start that the initial starting, the differential that there was at starting salaries assumed that they had started at the same time at a $20,000 differential. That would have been justified by prior experience and lack of prior experience and so forth, but that over a period of time those justifications would have disappeared in pertinence so that they no longer would have had any capacity to justify the distinction. Then we talked about the question of what about the possibility that the prior differences would continue to have relevance because they represented the experience, practical world experience that one had, which the other didn't. Do you have a position on that? Do you have a position on whether the additional restaurant experience that the comparator had continues to have pertinence after the passage of rules? Your Honor, I do believe it does. Mr. Perillo worked at high-level New York City restaurants, Aureole, La Madre, Patroon. These are at the joint appendix 199. Those are storied restaurants, and they are forever on his resume. Ms. Eisenhower did not. If you look at the record at page 123, she spent years 96 to 2002 at restaurants such as Prune and 8 Mile Creek. They are not the same level of stature, and that is at least somewhat acknowledged in terms of setting the starting salaries. But more importantly, she's not alleging that the starting salary was discriminatory. She's simply saying at some point there should be a true-up. But at what point and vis-a-vis whom? The concept that she identified Perillo to help everyone with a winnowing function, what it did was help her claim because, frankly, there's a much closer comparator in the record. His name is Gerard Viverito. He was hired in 2004. Ms. Eisenhower came in in 2002. Perillo came in in 2008. Mr. Viverito currently is paid less than both Ms. Eisenhower and Mr. Perillo. And even if he had been an associate professor, even if he had been promoted to professor, he would still be paid less than her. There's another comparator in the record who is a female, Maureen Chang. She's paid more than all of these people. So to whom do we true-up and at what point in time? They all teach the same classes. That's the criteria that Mr. Warshawski is referring to. What's the actual job day-to-day? The actual job is they show up, they teach cuisines of the Mediterranean, cuisines of Asia, cuisines of America. That's what all of these people do. They should all be treated in the same way but evaluated in terms of whether the differences are on the basis of sex. Again, it's not on the basis of sex. It's on the basis of income and qualifications. It's on the basis of equally applied collective bargaining agreement that's negotiated on behalf of these faculty members by their own union. There's nothing here to indicate otherwise. So to go back to the collective bargaining agreement, what in your view is the significance or insignificance of a collective bargaining agreement? You've invoked it several times. Absolutely. It is the factor other than sex. It establishes the factor other than sex, meaning there's no language in that collective bargaining agreement that's applied to every faculty member that has any differential on the basis of sex. Now, this is important because really the only reason – the entire argument rests on their interpretation of the Aldrich case and referring to any differences have to be rooted in job responsibilities and qualifications for the particular position. In that case, it actually was a job classification system, not a collective bargaining agreement. And in the job classification system, the women were cleaners, the men were custodians. You could only become a custodian if you passed a civil service exam at a specific level. But the court said the civil service exam doesn't appear to have any relation to the actual jobs cleaning of this school building. So – oh, excuse me. Ms. McCluskey, how does the collective bargaining agreement help you? You're distinguishing it from the civil service system in Aldrich. And here you have a collective bargaining agreement. What are we to make of that? The excellent point to be made here, which is somewhat relevant to even under the Aldrich standard, is that every increase that's awarded under the collective bargaining agreement, other than the annual salary percentage, is for exactly the type of thing that does make you a better teacher, that is completely related to your qualifications as a professor at the Culinary Institute. If you get an additional degree, you are a much more qualified teacher because you have more expertise in that specific area. If you achieve a promotion, you've met the standards that show you are a much more engaged faculty member within and without the school and in the industry at large. So even under this Aldrich standard, it's hard to imagine what qualifications would be more related to the job and the responsibilities than exactly these things that make you a more competent professor. Can you address the EEOC's argument that the district court erred by essentially not applying the correct summary judgment standard and didn't assess the collective bargaining agreement as an affirmative defense, but essentially used McDonnell Douglas and imposed a burden on the plaintiff that shouldn't have been there? Yes, Your Honor. The important issue there is that the district court actually did say that the Culinary Institute proved, as a matter of law, its affirmative defense. Not that just it offered and articulated, but it actually proved our affirmative defense. In terms of pretext, well, under the EEOC's own argument, once you prove the affirmative defense, that should end the inquiry. You should not continue on to another pretext stage. What's important here is it kind of makes no difference to the outcome of this case because, on appellant's brief at page 22, in the case of R, plaintiff does not contend that defendant's faculty compensation plan is a pretext for sentence discrimination. On the facts of this case, regardless of how you feel on the pretext issue, it won't matter because there's no evidence of pretext here and it's not being argued. And that's frankly dispositive of the whole case. There's nothing here that indicates any decisions were made about Ms. Eisenhower and her pay because of her sex. It's clear it was her qualification at hire. It was the even application of the collective bargaining agreement to herself and all of the other faculty members. She's not seeking equal treatment. She's seeking better treatment because she can see a man that's paid more than her and she doesn't like it. Well, there again are men that are paid less than her. There are women that are paid more than him. For there to be, on the basis of sex differential, you need to look at all the other comparators. And there has to be something indicating that her pay would have been different if she was a man. And there's literally nothing here. So if she has a good – you're saying if she has a good claim, it would require raising her. Then every man who's paid less than her or less than some woman would have to be raised as well. And everybody – everybody would have to be raised to the same level. Your Honor, that's my understanding, and I don't know where you can draw such a line. I think that's why it's important to look at all of the people who are doing the same job to see if any of the pay differences are on the basis of sex. And I don't think you can get a more clear case in a factual situation. And I would just note that in this particular case, there were cross motions for summary judgment. No one believes there's any disputed issues of fact. So what they have, they've put out. There's no evidence of pretext. All they have is one person who's paid more, and that's it. So is it correct to say that your position is that assuming that pointing to a single comparator is a prima facie case, meaning that if there's no rebuttal to it whatsoever, the plaintiff would win on that basis, but assuming that's true, you, by pointing to the CBA system, have definitively proved, there being no evidence to the contrary, that you've borne your burden under the affirmative defense, that you have shown a factor other than sex that completely explains how it came to be that they're paid at different levels. Exactly, Your Honor. Thank you. The Equal Pay Act was a statute enacted by Congress in 1963, specifically and expressly, to eliminate pay disparities between men and women doing the same job. That is Congress's command. And that statute does not require proof of intentional discrimination. That's very clear in this court's jurisprudence and in every other court's jurisprudence. So if you have a situation where two employees, a man and a woman, who are doing the same job, are not being paid the same, that is a prima facie violation under the EPA. It may strike us as a policy matter, as maybe that would be awkward, maybe it would be difficult to implement in certain workplaces, but it is the command of the EPA. Now the defendant's argument, talking about on the basis of sex, on the basis of gender, and looking at all these other comparators, is really taking us to the issue of intentional discrimination. That's not an issue in this case. The plaintiff is not alleging and has not put forward evidence of intentional gender discrimination with respect to her salary or with respect to other people's salaries. I understood the defendant's adversary to say, in response to my last question to her, that none of the things you're talking about, that's not what they're saying. They're simply saying that the pay between her and the comparator is completely dictated by a factor other than sex, being the CBA, that the CBA has, in a completely gender neutral fashion, called for certain step increases with every promotion, with every new degree and so forth, and it's resulted in pays that are not exactly aligned, but it wasn't sex that dictated it in any way, and you're not claiming that there was gender discrimination in the application of the CBA. That's her answer to your contention. So you put your finger exactly on the issue in this case, though, which is what constitutes a valid factor other than sex under the law. The Aldrich Court expressly said that if we don't interpret that part of the statute to have a job-relatedness factor, it will open a gaping loophole in the statute and it will undermine the mandate of equal pay for equal work. And, yes, that is the issue here. The plaintiff is not disputing that the salary disparity is the mathematical outcome of the application of this otherwise neutral collective bargaining framework. What we are arguing is that in the circumstances of this case- Why isn't the CBA job-related? Why isn't the CBA job-related? I mean, the apparent intention of the CBA is to treat everybody equally, that it doesn't matter what gender you are, nothing matters. It doesn't matter how prominent you are, how famous you are. The only things that matter are that at certain steps you receive rigorously prescribed increases and everybody receives the same increases for the same growth acquisition of new credentials. And why is that not a job-related thing? It seems to me to be very job-related. Because conceptually I think what has to be job-related is the resulting pay disparity. What the Aldrich Court said in looking at that civil service question, in Aldrich there was a distinction between cleaners and custodians. And what the school district said is, well, custodians get paid more because it's a competitive position and they have to take an exam for the position. And that's neutral. There was no question that that was facially neutral. And what this court said was, wait a minute. The school district has the obligation to tell us how taking that exam and making that particular position quote-unquote competitive is related to the actual job. So the actual factor that's determining the disparity has to be shown to be related to the work responsibilities or qualifications for the positions in question. And so if you have a situation where two people, again, are literally doing the exact same job and pretty, you know, well, yes, they're literally doing the exact same job and have for years, you can't just say, well, we kind of have just this essentially random arbitrary mathematical process. Yes, it's gender neutral, but it doesn't justify the pay disparity based on any job-related factors. It's just the mathematical outcome of this strange collective bargaining situation they have. I have no other thought. Your argument essentially suggests that the union has failed to fulfill its duty of fair representation. Now, I recognize that's a whole body of law with which we are not dealing here. But the concept of a union's duty of fair representation is very much at play here, I would guess. If you prevail, it would be a very strong suggestion that the union had failed to fulfill its duty of fair representation. Right? Without going into the question of the actual cause of action under labor law, but that's... Yes, I mean, as a philosophical matter, I would say that the union has an obligation to ensure that it is implementing agreements. Which it has failed to do. Well, I don't know exactly what the nature of the bargaining was that resulted in this collective bargaining agreement. And I want to make clear that I don't know the particulars of what that cause of action might look like here. But I would agree that, as you see in other cases, oftentimes these payment systems have some kind of outlet. So, for example, in the Briggs case, the Sixth Circuit case involving the University of Cincinnati, they had a procedure for a, quote, equitable pay adjustment. And so specifically in order to, on the one hand, you have this generalized system to help avoid intentional discrimination. But then in order to avoid a possible disparate situation, they also had a mechanism for an equitable pay adjustment. We don't have anything like that in this case. There's no mechanism whatsoever by which Anita Eisenhower can go to the school or go to the union, it's not in the collective bargaining agreement, and say this system has resulted in an unjustifiable pay disparity. We need to correct it. The only way she can address that is through the Equal Pay Act. Thank you very much. Thank you all, and we will take the matter under advisement. That's the last case on the calendar to be argued, so I'll ask the deputy to adjourn court. Court is adjourned.